1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TORIBIO JUAREZ, | 1:05-CV-01233 GSA HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT |
| A. P. KANE, Warden, | |
| Respondent. | ORDER DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The parties having voluntarily consented to exercise of Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1), this case was assigned to the undersigned for all purposes, including entry of final judgment.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction on November 18, 2002, by jury trial of one count of second degree murder in violation of Cal. Penal Code § 187. (LD-10; CT 134[1].) The jury also found true the allegation that Petitioner had personally

---

[1]"LD" refers to the documents lodged by Respondent with his answer; "CT" refers to the Clerk's Transcript on Appeal.

1   used a knife during the commission of the offense. (CT 134.) The trial court found true the allegation

2   that Petitioner had sustained a prior serious felony conviction. (CT 134-135.) On January 6, 2003,

3   Petitioner was sentenced to an indeterminate term of thirty years to life plus six years. (LD-10; CT

4   313, 316-317.)

5        Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District

6   (hereinafter "Fifth DCA"). On July 22, 2004, the Fifth DCA affirmed the judgment. (LD-10.)

7   Petitioner then filed a petition for review in the California Supreme Court. (LD-11.) The California

8   Supreme Court denied the petition on September 29, 2004. (LD-12.)

9        On September 29, 2005, Petitioner filed the instant federal petition for writ of habeas corpus

10  in this Court. Petitioner presents the following grounds for relief: 1) "The trial court had the duty to

11  instruct the jury that an initial aggressor may inform his opponent that he no longer wishes to fight

12  either by words, or in the instant case, by conduct; the omission of this concept renders the

13  instruction given on the subject erroneous"; and 2) "The trial court had the sua sponte duty to

14  instruct the jury on the mistake of fact defense."  On February 21, 2006, Respondent filed an answer

15  to the petition. Petitioner filed a traverse to the answer on March 17, 2006.

16                              **FACTUAL BACKGROUND**[2]

17       During the evening hours of May 4, 2002, George Duarte (hereinafter "Duarte") and his

18  stepson, Eusebio Lopez ("Lopez"), visited the Montecito Club and Junior's (a bar and adjacent

19  restaurant) in Bakersfield, California. Shortly after midnight, Duarte was standing outside in front of

20  the club. Petitioner was also outside, as were bouncers Craig Bell ("Bell") and Daymeon Byrd

21  ("Byrd"), and patrons Emma Ramirez and Nohemy Dorado. Lopez was eating inside Junior's.

22       Petitioner took a cigarette out of the hands of a young man. Duarte tried to convince

23  Petitioner to give it back. Petitioner[3] hit Duarte in the face, knocking off his glasses. Bell stepped in

24  front of Duarte. Petitioner lunged at Duarte and Bell pushed him backwards.

25       Hearing the commotion, Lopez came outside. He saw that Duarte had a cut on the bridge of

26  _____

27       [2]The facts are derived from the factual summary set forth by the Fifth DCA in its opinion of July 22, 2004, and are
     presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). (LD-10 at 2-4.)

28       [3]The state court opinion mistakenly states Nohemy Dorado hit Duarte.

1   his nose and his glasses were on the ground. As Duarte bent over to pick up his glasses, Petitioner

2   tried to kick him in the head. Lopez heard Duarte say, "come on, come on." Byrd saw Duarte reach

3   into his back right pocket and pull out a box cutter. Byrd told him to put it away, and Duarte put it

4   back in his pocket.

5         Petitioner continued the attack. He pulled out a knife and lunged at Duarte. Ramirez and

6   Dorado thought that it looked like Petitioner was trying to stab Duarte. Petitioner almost hit Bell,

7   who was attempting to restrain him. As Petitioner lunged toward Duarte, Byrd pepper-sprayed him.

8   Petitioner screamed and stumbled about, rubbing his eyes.

9         Petitioner walked or ran into the street and left the area. Ramirez heard Petitioner cursing and

10  making threatening statements. She saw Petitioner stop, look at Duarte and say, "I'm coming back

11  for you." Lopez saw a short, young Hispanic man leave with Petitioner.

12        A few minutes later, Duarte and Lopez left together in the same direction Petitioner had

13  gone. They planned to cross the street at the corner sidewalk and walk down the other side of the

14  street to Lopez's truck. As they approached the corner, Lopez saw Petitioner and his companion

15  walk toward them. Lopez told Duarte that Petitioner was coming back and that he had something

16  shiny in his hand. Duarte handed Lopez his glasses. Lopez believed that Petitioner and Duarte were

17  going to fight. Petitioner was holding the shiny object down toward the ground; Lopez could not tell

18  if it was a knife or a gun. Petitioner approached Duarte, moving the shiny item from his left hand to

19  his right hand. Duarte reached into his left back pocket to get his box cutter. Petitioner stabbed

20  Duarte once in the stomach with the knife. Petitioner and his companion nonchalantly walked away.

21        Duarte turned to Lopez and said, "me pico," which is a Spanish phrase roughly meaning "he

22  stuck me." Duarte collapsed. He was holding the box cutter and it landed on the ground. Its blade

23  was closed. Duarte bled to death from a six-inch deep stab wound in his abdomen that punctured his

24  pancreas and severed numerous blood vessels. Duarte's blood alcohol level was .24 at death.

25        While at the crime scene, Lopez had told a police officer that Petitioner had approached

26  Duarte on the street corner and they started arguing. After Lopez saw a shiny object in Petitioner's

27  hand, he convinced Duarte to walk away. Duarte stopped, turned and approached Petitioner holding

28  his box cutter in his hand. Petitioner responded by moving a shiny object to his right hand stabbing

Duarte.

Petitioner's live-in girlfriend, Leah Pacheco, testified that Petitioner was hysterical and intoxicated when he arrived home during the early morning hours. His eyes were red and burning. His left eye was bruised and his lip was cut. He said that he had been involved in a fight. He told her that he "was coming home and they followed me and they attacked me." He repeatedly said that "they wanted to kill him."

At approximately 10:00 p.m. on May 5, 2002, Bell saw Petitioner sitting in front of Junior's. He telephoned the police and Petitioner was arrested. Officers found a black folding knife in Petitioner's right rear pants pocket.

Two officers interviewed Petitioner after his arrest. Initially, Petitioner said that he stabbed Duarte because Duarte had pepper-sprayed him. Then Petitioner said that he was standing outside when "they coming after me and they try to stabbing me." Then they "spray me my eyes." Petitioner did not have his knife out when he was sprayed with the pepper spray. After he cleaned his eyes, he was attacked again. In response, "I stop and I come back. I stab him."

Later during the interview, Petitioner said that after he was pepper-sprayed, he left the area. About four men followed him and attacked him. One of the men was armed with a thick stick. This man hit Petitioner in the eyes with this stick. This was the same man who had pepper-sprayed him. Petitioner said he stabbed the man who hit him with the stick one time and then he ran away. On the way home, he was chased by a lot of guys on bicycles. They were trying to kill him. Petitioner said that he was not trying to kill the man that he stabbed. He used the knife that was in his pocket when he was arrested.

None of the witnesses saw anyone at the corner with a stick. Petitioner did not tell his girlfriend that anyone had attacked him with a stick.

An investigator with the public defender's office interviewed Lopez and Ramirez. Lopez told the investigator that Duarte had said, "come on," to Petitioner before Petitioner approached him at the corner, not during the earlier confrontation. Ramirez did not tell the investigator that Petitioner had threatened Duarte after Byrd pepper-sprayed him.

1

**DISCUSSION**

2

**I.  Jurisdiction**

3

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

4

to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

5

the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

6

375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

7

Constitution.  In addition, the conviction challenged arises out of the Kern County Superior Court,

8

which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly,

9

the Court has jurisdiction over the action.

10

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

11

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

12

Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114

13

F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

14

*denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)

15

(holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was

16

filed after the enactment of the AEDPA; thus, it is governed by its provisions.

17

**II.  Legal Standard of Review**

18

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

19

pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

20

Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

21

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

22

Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

23

(2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

24

adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

25

application of, clearly established Federal law, as determined by the Supreme Court of the United

26

States" or "resulted in a decision that was based on an unreasonable determination of the facts in

27

light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

28

538 U.S. at 70-71; see Williams, 529 U.S. at 413.

1   As a threshold matter, this Court must "first decide what constitutes 'clearly established

2   Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71,

3   *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

4   must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

5   of the relevant state-court decision." <u>Id.</u>, *quoting* <u>Williams</u>, 592 U.S. at 412. "In other words, 'clearly

6   established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

7   the Supreme Court at the time the state court renders its decision." <u>Id</u>.

8   Finally, this Court must consider whether the state court's decision was "contrary to, or

9   involved an unreasonable application of, clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72,

10   *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

11   writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

12   question of law or if the state court decides a case differently than [the] Court has on a set of

13   materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72.

14   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

15   court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

16   applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

17   "[A] federal court may not issue the writ simply because the court concludes in its

18   independent judgment that the relevant state court decision applied clearly established federal law

19   erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id</u>. at 411.  A

20   federal habeas court making the "unreasonable application" inquiry should ask whether the state

21   court's application of clearly established federal law was "objectively unreasonable." <u>Id</u>. at 409.

22   Petitioner has the burden of establishing that the decision of the state court is contrary to or

23   involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>,

24   94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

25   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

26   decision is objectively unreasonable.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th

27   Cir.1999).

28   AEDPA requires that we give considerable deference to state court decisions. The state

1  court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

2  interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537

3  U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

4  **III.  Review of Petition**

5  **A.  Ground One**

6  In his first claim for relief, Petitioner alleges the trial court erred in failing to instruct the jury

7  that an initial aggressor may inform his opponent that he not longer wishes to fight, either by words

8  or by conduct.

9  1.  Applicable Law

10  As a preliminary matter, the Court notes that an allegation that a jury instruction is incorrect

11  under state law does not form a basis for federal habeas corpus relief.  Estelle v.  McGuire, 502 U.S.

12  62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of

13  state law."). In reviewing an ambiguous instruction, the inquiry is "'whether there is a reasonable

14  likelihood that the jury has applied the challenged instruction in a way' that violates the

15  Constitution." Id. at 72, *quoting* Boyde v. California, 494 U.S. 370, 380 (1990). A jury instruction

16  violates the Constitution if its use "so infused the trial with unfairness as to deny due process of

17  law." Lisenba v. California, 314 U.S. 219, 228 (1941). The instruction "must be considered in the

18  context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 67, *citing* Cupp v.

19  Naughton, 414 U.S. 141, 147 (1973). In the event constitutional error occurred, the court must apply

20  the harmless error analysis mandated by Brecht v. Abrahamson, 507 U.S. 619 (1993). In Brecht, the

21  Supreme Court held that habeas relief based on trial error may only be granted when that error "'had

22  substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. at 637,

23  *quoting* Kotteakos v. United States, 328 U.S. 750, 776 (1946).

24  2.  Review of Claim by State Courts

25  The claim was first presented on direct appeal to the Fifth DCA.  On July 22, 2004, the Fifth

26  DCA denied the claim in a reasoned opinion. (LD 10.) Petitioner then filed a petition for review in

27  the California Supreme Court. (LD 11.) The petition was denied on October 4, 2004. (LD 12.) The

28  California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is

1    presumed to have denied the claims presented for the same reasons stated in the opinion of the Fifth

2    DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

3            The appellate court analyzed and rejected the claim as follows:

4            CALJIC No. 5.54 explains the limited circumstances under which the right to self-
     defense is available to a person who has initiated the assault. One of three requirements is
5    that the person "has clearly informed [his] opponent that [he] has stopped fighting." (CALJIC
     No. 5.54, as given.) [Petitioner] argues that the jury erroneously could have believed that the
6    word "inform" required [Petitioner] to have verbally notified Duarte that he had stopped
     fighting. Therefore, the court had a sua sponte obligation to modify CALJIC No. 5.54 to
7    clarify that withdrawal may be expressed verbally or nonverbally. We disagree.

8            This exact argument recently was rejected in People v. Nem (2003) 114 Cal.App.4th
     160 (Nem). Because we find Nem's reasoning persuasive and will adopt its conclusion on this
9    issue, we quote the entirety of its discussion:

10           Appellant now contends that CALJIC No. 5.54 is incorrect and misleading
     because it told jurors that he was obligated verbally to inform his opponent, in this
11   case Dr. Kim Fang, that he wanted to and had stopped fighting in order to reinstate his
     right of self-defense.

12
             Appellant's contention requires us to determine whether it is reasonably likely
13   jurors understood the instruction as appellant suggests. [Citation.] In making that
     determination, we must consider several factors including the language of the
14   instruction in question (ibid.), the record of the trial [citation], and the arguments of
     counsel. [Citation.]

15
             Nothing in the wording of the instruction itself supports the interpretation
16   appellant has advanced. The instruction only requires that a defendant "inform" his
     opponent that he wants to and has stopped fighting. The usual definition of the word
17   "inform" is "to impart information or knowledge." (Webster's Collegiate Dict. (10th
     ed.2001) p. 598.) There is no verbal component to this definition. Indeed, it is
18   commonly understood that information can be imparted verbally (e.g., "I give up"), or
     nonverbally (e.g., dropping one's weapon and raising one's hands).

19
             Neither does the trial record or the argument of counsel support appellant's
20   interpretation. As to the former, while there was testimony that indicated appellant
     may have been frightened by the violent situation he helped create and by Dr. Kim
21   Fang's aggressive response, appellant has not cited any evidence that suggests this
     defendant was required to communicate verbally his intent to stop fighting. As to the
22   latter, the prosecutor simply reiterated the elements of the offense and argued they had
     not been satisfied. Again, there was no suggestion that verbal communication was
23   required.

24           Based on this record, we conclude it is not reasonably likely the jurors
     understood CALJIC No. 5.54 to require that he communicate verbally that he wanted
25   to and had stopped fighting. There was no error. (Nem, supra, 114 Cal.App.4th at pp.
     165-166, fn. omitted.)

26
     We will follow Nem's reasoning and apply it here. Accordingly, we conclude that
27   CALJIC No. 5.54 is not reasonably susceptible to the interpretation advanced by [Petitioner].
     The challenged language encompasses communication by words or nonverbal conduct; it
28   accurately reflects the state of the law. Furthermore, just as in Nem, the record in this case

does not indicate that it is reasonably likely the jurors understood CALJIC No. 5.54 to require that he communicate verbally that he had stopped fighting. Contrary to [Petitioner]'s appellate argument, the prosecutor did not specifically argue that [Petitioner] was required to verbally inform Duarte that he had stopped fighting. At best, there was an oblique reference to what [Petitioner] did not do. "Did anybody hear testimony that he went no, don't want to fight any more. I'm stopping? No. He has clearly informed his opponent that he wants to stop fighting. Excuse me, Mr. Duarte, I want to stop fighting now, we are not going to do that. No he was doing this. Okay. He has clearly informed his opponent that he is going to stop. I've stopped fighting now. Come on, that didn't happen. There was never any evidence of that at all." At no time did the prosecutor use the word "say" or the word "tell," which could have indicated that verbal notification was required.

We are aware that *People v. Hernandez* (2003) 111 Cal.App.4th 582 (*Hernandez*) reached a different conclusion regarding the implications of the word "inform" in CALJIC No. 5.54, and concluded that the instruction was ambiguous on this point. [Citation.] However, the *Nem* court found *Hernandez* unconvincing, and we agree with *Nem*'s assessment of the weakness of *Hernandez*'s legal reasoning. *Nem* explained that *Hernandez* "said CALJIC No. 5.54 was ambiguous; however, it did not explain why it reached that conclusion other than to state, '[a]rguably, a requirement that an attacker "inform" an opponent of his or her withdrawal could be met by either a verbal or a nonverbal communication. It would *not* seem, however, to be met by actions that simply *constitute* withdrawal.' [Citation.] From this passage it appears the *Hernandez* court concluded it was reasonably likely the jurors would interpret CALJIC No. 5.54 as requiring a verbal statement because a particular type of conduct, withdrawal, is insufficient to communicate an intent to stop fighting." (*Nem, supra,* 114 Cal.App.4th at p. 166.) Like *Nem*, we do not find *Hernandez* persuasive and we decline to adopt its view on this issue. [Footnote.]

In any event, "even if we were to assume arguendo, that the jurors would have interpreted CALJIC No. 5.54 as [Petitioner] suggests, any possible error was harmless." (*Nem, supra,* 111 Cal.App.4th at p. 167.) There is no credible evidence suggesting that [Petitioner] was defending himself when he stabbed Duarte. Rather, the evidence overwhelmingly shows that [Petitioner] was the aggressor both during the initial altercation and later when he stabbed Duarte. Even if the jury had been specifically instructed that withdrawal could be by both words or actions, it is not reasonably probable that it would have concluded that [Petitioner] had withdrawn from the fight and that he had stabbed Duarte in self-defense, either perfect or imperfect. Since the jury would not have returned a more favorable verdict if CALJIC No. 5.54 had been modified, [Petitioner] was not prejudiced by the alleged instructional error. (*Ibid.* [neither error nor prejudice]; *Hernandez, supra,* 110 Cal.App.4th at p. 589 [instructional ambiguity was harmless because there was no evidence that appellant had attempted to withdraw].)

(LD 10 at 8-11.)

3.  Review of Claim

Petitioner has failed to demonstrate that the state court determination was contrary to, or an unreasonable application of, Federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d). As discussed by the state appellate court, there is nothing in the record to indicate the jury understood that CALJIC No. 5.54 required Petitioner to *verbally* communicate that he had ceased fighting. But in any case, there is no question that the alleged ambiguity was harmless.

1   The record reflected that Petitioner was the initial aggressor outside of the bar and the

2   aggressor on the street. When Duarte politely asked Petitioner to return a cigarette to a young man,

3   Petitioner struck Duarte by hitting him in the face and knocking off his glasses. (RT[4] 183, 210-211.)

4   The bouncers tried to intervene but Petitioner attempted to lunge at Duarte, kick him in the head, and

5   stab him with a knife as Duarte attempted to back away. (RT 137-140, 171, 176, 184, 196-197.)

6   Eventually, the bouncers pepper-sprayed Petitioner at which time Petitioner left the area. (RT 139,

7   141.) A witness heard Petitioner stop, look at Duarte, and say, "I'm coming back for you." (RT 202-

8   205.)  When Duarte and his stepson Lopez later left the bar, Petitioner and his companion

9   approached them on the street. (RT 79-82, 200.) Lopez told his stepfather Petitioner was coming

10  back. (RT 81.) Lopez saw Petitioner was holding something shiny in his left hand. (RT 81-82.) He

11  could not tell whether it was a knife or a gun, but Petitioner was carrying it pointed straight down.

12  (RT 82.) As Petitioner approached, he moved the object from his left to his right hand. (RT 83.)

13  Duarte stood still and Petitioner walked straight up to him without stopping and stabbed him in the

14  stomach area with his knife. (RT 85-91.)

15      The evidence shows Petitioner never verbally or nonverbally expressed a desire to stop

16  fighting. As discussed above, the record demonstrated he was the aggressor and attacked on both

17  occasions. Therefore, any ambiguity in the instruction given was completely harmless. The state

18  court's rejection of this claim was entirely consistent with Supreme Court precedent.

19      **B.  Ground Two**

20      Petitioner next claims the trial court erred in failing to sua sponte instruct the jury with a

21  mistake of fact instruction as set forth in CALJIC No. 4.35:

22          An act committed or an omission made in ignorance or by reason of a mistake of fact
            which disproves any criminal intent is not a crime. Thus a person is not guilty of a crime if
23          [he] [she] commits an act or omits to act under an actual [and reasonable] belief in the
            existence of certain facts and circumstances which, if true, would make the act or omission
24          lawful.

25  Petitioner contends the jury could have found, based on the evidence, that Petitioner had the

26  mistaken belief he had the right to self-defense when the stabbing incident took place on the street,

27

28
    _____
        [4]"RT" refers to the Reporter's Transcript on Appeal.

1   because he feared Duarte would pepper-spray him again. He argues the trial court's failure to so

2   instruct was constitutional trial error which had a substantial and injurious affect on the verdict.

3       1.  Applicable Law

4       As set forth above, the Court must inquire whether the jury instructions "so infused the trial

5   with unfairness as to deny due process of law." <u>Lisenba</u>, 314 U.S. at 228. In the event constitutional

6   error occurred, the court must determine whether the error "had substantial and injurious effect or

7   influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637. In addition, the Court notes that

8   Petitioner's burden is "especially heavy" with this claim, because "[a]n omission or an incomplete

9   instruction is less likely to be prejudicial than a misstatement of law." <u>Henderson v. Kibbe</u>, 431 U.S.

10  145, 155 (1977).

11      2.  Review of Claim by State Courts

12      As with the first claim, this claim was first presented on direct appeal to the Fifth DCA where

13  it was denied in a reasoned opinion. (LD 10.) It was then presented in a petition for review in the

14  California Supreme Court where it was summarily denied. (LD 11, 12.) The California Supreme

15  Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied

16  the claims presented for the same reasons stated in the opinion of the Fifth DCA.  <u>Ylst v.</u>

17  <u>Nunnemaker</u>, 501 U.S. 797, 803 (1991).

18      In rejecting this claim, the appellate court stated as follows:

19          The applicable legal principles are well established. "'It is settled that in criminal
        cases, even in the absence of a request, the trial court must instruct on the general principles
20      of law relevant to the issues raised by the evidence. [Citation.] The general principles of law
        governing the case are those principles closely and openly connected with the facts before the
21      court, and which are necessary for the jury's understanding of the case.'" [Citation.] With
        respect to defenses, "a sua sponte instructional duty arises 'only if it appears that the
22      defendant is relying on such a defense, or if there is substantial evidence supportive of such a
        defense *and* the defense is not inconsistent with the defendant's theory of the case.'"
23      [Citation.] Yet, "'[a] party is not entitled to an instruction on a theory for which there is no
        supporting evidence.'" [Citation.]

24
25          CALJIC No. 4.35 [footnote omitted] instructs the jury in paragraph three of section
        26, which provides that "[p]ersons who committed the act or made the omission charged
26      under an ignorance or mistake of fact, which disproves any criminal intent," are not "capable
        of committing crimes." [Citation.] [Petitioner] contends that because he erroneously believed
27      that "Duarte was armed with pepper spray" when he stabbed him, the court had a sua sponte
        obligation to instruct on this legal principle. The argument fails for two reasons.

28          First, the underlying factual premise is faulty. [Petitioner]'s appellate argument that

he believed that Duarte was armed with pepper spray when he stabbed him is based exclusively on [Petitioner]'s interview with police after his arrest. However, at no time during this interview did [Petitioner] tell the officers that he thought Duarte was still armed with pepper spray when he stabbed him. Further, [Petitioner] never said that he stabbed Duarte because he feared being pepper sprayed again. Rather, [Petitioner] initially called Duarte a "whore" and a "[f]ucking dog" and said that he "got him with the iron or tool" because he "put fucking spray in my eyes." [Petitioner] said that he walked outside the bar and "they coming after me and they try to stabbing me." Then "they go they spray me my eyes." [Petitioner] said that he cleaned his eyes and walked away. Then "I stop and I come back. I stab him." Later in the interview [Petitioner]'s story changed. He said that Duarte was one of four men who attacked him after he walked away from the confrontation in the parking lot. He stabbed Duarte because Duarte was armed with a big stick and had hit him in the eyes with it. Thus, [Petitioner]'s remarks during his interview support two alternative theories: (1) he stabbed Duarte in revenge because he was angry at being pepper sprayed and he erroneously believed Duarte was the person who sprayed him; or (2) he stabbed Duarte in self-defense because four men, including Duarte, attacked him and Duarte had hit him with a big stick. However, his remarks do not support the theory that [Petitioner] stabbed Duarte because he believed that Duarte was still armed with pepper spray and he thought that he was in imminent danger of being sprayed a second time. There is no other trial evidence supporting this factual premise.

Second, [Petitioner] assumes that all factual errors require instruction on mistake of fact. He is wrong. Paragraph three of section 26 explains the principle that "people do not act unlawfully if they commit acts based on a reasonable and honest belief that certain facts and circumstances exist which, if true, *would render the act lawful*." [Citation.] In this case, the stabbing would still be unlawful even if Duarte had pepper sprayed [Petitioner] in the parking lot. Duarte's prior act of pepper spraying [Petitioner] would not legally justify [Petitioner]'s subsequent attack on Duarte. [Petitioner]'s mistake of fact concerning the identity of the person who pepper sprayed him in front of the restaurant did not negate the specific intent required to commit second degree murder. It neither shows that when [Petitioner] stabbed Duarte on the corner he lacked the intent to kill nor does it establish that he lacked the intent to perform an act dangerous to human life with knowledge of the danger to an conscious disregard of human life.

We are not convinced by [Petitioner]'s assertion that instruction on mistake of fact was required because his erroneous belief impacts his self-defense and unreasonable self-defense theories. Under the instructions given, the jury could consider all of the circumstances to determine whether [Petitioner] stabbed Duarte because he maintained a reasonable or an unreasonable but honestly held belief that he was in imminent danger of death or great bodily injury and self-protection was necessary. (CALJIC Nos. 5.12 & 5.17.) These circumstances include [Petitioner]'s alleged believe that it was Duarte who had pepper sprayed him. Adequate explanation of the relevant legal concepts did not require CALJIC No. 4.35 to be given.

In any event, the alleged instructional error is harmless. No reasonable jury would have credited [Petitioner]'s version of events. His evolving explanation to the officers was nothing more than a series of lies told in a desperate and pathetic attempt to justify the wholly unprovoked attack on Duarte. The weight of the evidence shows that [Petitioner] was the aggressor in both of his encounters with Duarte. It is not even remotely possible that the jury would have returned a more favorable verdict if it had been given CALJIC No. 4.35. [Citation.]

(LD 10 at 5-8.)

1      3.  Review of Claim

2          The state court determined the sua sponte instruction was not warranted under California law.

3   As correctly argued by Respondent, federal courts are bound by state court rulings on questions of

4   state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942

5   (1989). Moreover, Petitioner has failed to carry his "especially heavy" burden of demonstrating

6   fundamental unfairness in the trial court's failure to give this instruction. The circumstances of the

7   offense did not qualify for a mistake of fact instruction since the act of stabbing could not be

8   considered lawful for the simple fact that the threat of being pepper-sprayed cannot legally justify a

9   stabbing. In addition, any failure to instruct was harmless. His various tales of the encounter had no

10  support whatsoever in the record. As found by the appellate court, they were "nothing more than a

11  series of lies told in a desperate and pathetic attempt to justify the wholly unprovoked attack on

12  Duarte." (LD 10 at 8.)  Petitioner has failed to show that the state court determination was contrary

13  to, or an unreasonable application of, Federal law as determined by the Supreme Court, or that the

14  decision that was based on an unreasonable determination of the facts in light of the evidence

15  presented. 28 U.S.C. § 2254(d). The petition must be denied.

16  **IV.  Certificate of Appealability**

17          A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

18  district court's denial of his petition, and an appeal is only allowed in certain circumstances.  Miller-

19  El v. Cockrell, 123 S.Ct. 1029, 1039 (2003).  The controlling statute in determining whether to issue

20  a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

21              (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
                district judge, the final order shall be subject to review, on appeal, by the court
22              of appeals for the circuit in which the proceeding is held.

23              (b) There shall be no right of appeal from a final order in a proceeding to test the
                validity of a warrant to remove to another district or place for commitment or trial
24              a person charged with a criminal offense against the United States, or to test the
                validity of such person's detention pending removal proceedings.
25
                (c)     (1) Unless a circuit justice or judge issues a certificate of appealability, an
26                      appeal may not be taken to the court of appeals from–

27                          (A) the final order in a habeas corpus proceeding in which the
                            detention complained of arises out of process issued by a State
28                          court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 123 S.Ct. at 1034; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 123 S.Ct. at 1040.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

## ORDER

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2) The Clerk of Court is DIRECTED to enter judgment for Respondent; and

3) The Court DECLINES to issue a certificate of appealability.


IT IS SO ORDERED.

Dated:   **June 25, 2008**                    **/s/ Gary S. Austin**
                                         UNITED STATES MAGISTRATE JUDGE